**No. 23-55700**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

CONSUMER FINANCIAL PROTECTION BUREAU,
STATE OF MINNESOTA, STATE OF NORTH CAROLINA, AND
THE PEOPLE OF THE STATE OF CALIFORNIA,
Plaintiffs-Appellees,

*v.*

KAINE WEN, A/K/A WENTING KAINE DAI, WEN TIN DAI, AND KAINE WEN DAI IN HIS INDIVIDUAL CAPACITY AND AS TRUSTEE OF THE KAINE WEN 2017 TRUST,
Defendant-Appellant.

---

On Appeal from the United States District Court
for the Central District of California
Hon. Michael W. Fitzgerald
Case No. 8:19-cv-01998

---

# ANSWERING BRIEF OF PLAINTIFFS-APPELLEES - REDACTED

---


Seth Frotman
*General Counsel*
Steven Y. Bressler
*Deputy General Counsel*
Kevin E. Friedl
*Acting Assistant General Counsel*
Amanda J. Krause
Stephanie B. Garlock
*Counsel*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, D.C. 20552
(202) 435-7965
amanda.krause@cfpb.gov


(*Counsel continued inside*)

Hydee Feldstein Soto
*Los Angeles City Attorney*
Jonathan H. Eisenman
*Deputy City Attorney*
The People of the State of California
Los Angeles City Attorney's Office
201 N Figueroa Street
Los Angeles, CA 90012
(213) 978-2212
jonathan.eisenman@lacity.org

Keith Ellison
*Attorney General*
Evan Romanoff
*Assistant Attorney General*
State of Minnesota
445 Minnesota Street, Suite 600
St. Paul, MN 55101-2130
(651) 728-4126
evan.romanoff@ag.state.mn.us

Joshua H. Stein
*Attorney General*
M. Lynne Weaver
*Special Deputy Attorney General*
State of North Carolina
114 W. Edenton Street
Raleigh, NC 27602
(919) 716-6039
lweaver@ncdoj.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..... ii

GLOSSARY ..... viii

JURISDICTIONAL STATEMENT ..... 1

STATEMENT OF ISSUES ..... 1

PERTINENT STATUTES AND RULES ..... 2

STATEMENT OF THE CASE ..... 2

A. Factual Background ..... 2

1. The student loan debt relief enterprise ..... 2
2. Wen's role in the enterprise ..... 6

B. Statutory and Regulatory Background ..... 10

C. Proceedings and Decision Below ..... 13

1. Plaintiffs' initiation of this action ..... 13
2. Wen's failure to comply with the asset freeze and contempt order ..... 14
3. Wen's conduct during discovery ..... 16
4. The district court's denial of Wen's motion to reopen discovery and grant of Plaintiffs' motion for summary judgment ..... 17
5. The receiver's post-judgment motion for order to show cause why Wen should not be held in contempt ..... 20

SUMMARY OF ARGUMENT ..... 21

ARGUMENT ....................................................................................................23
I. The district court acted well within its discretion in declining to modify the scheduling order to reopen discovery. .......................................23
II. The district court correctly found no genuine dispute of material fact as to Wen's liability between November 2015-June 2017. ...........................27
III. The district court correctly held Wen jointly and severally liable for redress. .....................................................................................................37
IV. The district court correctly ordered Wen to pay a large penalty. ...................40
A. The district court ordered an appropriate civil penalty under the statute and in light of the facts here. ........................................................41
B. The $148 million penalty is constitutionally permissible. ..........................51
CONCLUSION ................................................................................................55
CERTIFICATE OF COMPLIANCE
STATUTORY ADDENDUM

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................................................................................33

*Braxton-Secret v. A.H. Robins Co.*,
769 F.2d 528 (9th Cir. 1985) .......................................................................46

*CFPB v. CashCall, Inc.*,
2023 WL 2009938 (C.D. Cal. Feb. 10, 2023) ..............................................48

*CFPB v. CashCall, Inc.*,
35 F.4th 734, 749 (9th Cir. 2022) .......................................................... 28, 43

*CFPB v. Future Income Payments*,
2020 WL 6162947, at *8–9 (D.S.C. May 21, 2020) .....................................48

*CFPB v. Gordon*,
819 F.3d 1179, 1193–94 (9th Cir. 2016) .......................................................33

*CFPB v. Nesheiwat*,
2022 WL 17958636, at *1 (9th Cir. Dec. 27, 2022).............................. 34, 41

*Christian Legal Soc'y v. Wu*,
626 F.3d 483 (9th Cir. 2010) .......................................................................36

*Cornwell v. Electra Cent. Credit Union*,
439 F.3d 1018 (9th Cir. 2006) ............................................................. 23, 24

*Cottonwood Env't L. Ctr. v. Edwards*,
86 F.4th 1255 (9th Cir. 2023) .......................................................................28

*Cyntegra, Inc. v. IDEXX Lab'ys, Inc.*,
322 F. App'x 569 (9th Cir. 2009) ..................................................................26

*FTC v. Chapman*,
714 F.3d 1211 (10th Cir. 2013) ............................................................ 34, 35

*FTC v. Com. Planet, Inc.*,
2019 WL 13146766 n.1 (C.D. Cal. May 14, 2019).......................................39

*FTC v. Com. Planet, Inc.*,
815 F.3d 593 (9th Cir. 2016) ....................................................................39

*FTC v. HES Merch. Servs. Co. Inc.*,
2016 WL 10880223 (M.D. Fla. Oct. 26, 2016) ...........................................35

*FTC v. Ivy Cap., Inc.*,
616 F. App'x 360 (9th Cir. 2015) .......................................................... 29, 31

*FTC v. Network Servs. Depot, Inc.*,
617 F.3d 1127 (9th Cir. 2010) ............................................................... 30, 44

*FTC v. Publ'g Clearing House, Inc.*,
104 F.3d 1168 (9th Cir. 1997) ..................................................................29

*FTC v. WV Universal Mgmt., LLC*,
877 F.3d 1234 (11th Cir. 2017) ............................................................. 35, 38

*Gordon v. Virtumundo, Inc.*,
575 F.3d 1040 (9th Cir. 2009) ..................................................................41

*Hartford Acc. & Indem. Co. v. J.R.L.A. Compliance, Inc.*,
904 F.2d 40 (9th Cir. 1990) ......................................................................50

*Hateley v. SEC*,
8 F.3d 653 (9th Cir. 1993) ........................................................................37

*Honeycutt v. United States*,
581 U.S. 443 (2017)....................................................................................38

*Hotel & Rest. Emps. and Bartenders Int'l. Union v. Rollison*,
615 F.2d 788 (9th Cir. 1980) ....................................................................50

*Huffman v. Lindgren*,
81 F.4th 1016 (9th Cir. 2023) ...................................................................27

*In re Gugliuzza*,
852 F.3d 884 (9th Cir. 2017) ....................................................................39

*In re O'Gorman*,
F.4th 1047, 1058 (9th Cir. 2024) ..............................................................46

*Johnson v. Mammoth Recreations, Inc.*,
975 F.2d 604 (9th Cir. 1992) ....................23

*Kama v. Mayorkas*,
107 F.4th 1054 (9th Cir. 2024) ....................28

*Kilpatrick v. Kijakazi*,
35 F.4th 1187 (9th Cir. 2022) .................... 27, 41

*Manning v. Dep't of Veterans Affs.*,
2022 WL 1714292 (9th Cir. May 27, 2022)....................26

*Moreno Roofing Co. v. Nagle*,
99 F.3d 340 (9th Cir. 1996) ....................36

*Perez v. City of Fresno*,
98 F.4th 919 (9th Cir. 2024) ....................32

*Pimentel v. City of L.A.*,
974 F.3d 917 (9th Cir. 2020) .................... 52, 55

*Rand v. Roland*,
154 F.3d 952 (9th Cir. 1998) ....................26

*Ross v. White*,
2022 WL 543201 (9th Cir. Feb. 23, 2022) ....................27

*SEC v. Husain*,
70 F.4th 1173 (9th Cir. 2023) ....................41

*SEC v. Jarkesy*,
144 S. Ct. 2117 (2024).................... 27, 40

*SEC v. M & A West, Inc.*,
538 F.3d 1043 (9th Cir. 2008) .................... 50, 51

*SEC v. Murphy*,
50 F.4th 832 (9th Cir. 2022) .................... 51, 54, 55

*SEC v. Rajaratnam*,
918 F.3d 36 (2d Cir. 2019) ....................54

*SEC v. Rosenthal*,
426 F. App'x 1 (2d Cir. 2011) ........................................................................54

*Soto v. Sweetman*,
882 F.3d 865 (9th Cir. 2018) ........................................................................26

*Tull v. United State*s,
481 U.S. 412 (1987)........................................................................................41

*United States v. $100,348.00 in U.S. Currency*,
354 F.3d 1110 (9th Cir. 2004) ......................................................................53

*United States v. Bajakajian*,
524 U.S. 321 (1998)................................................................................ 51, 52

*United States v. TKW Ltd. P'ship*,
2023 WL 3116460 (9th Cir. Apr. 27, 2023)..................................................47

*United States v. Toth*,
33 F.4th 1 (1st Cir. 2022)...............................................................................52

*Yates v. Pinellas Hematology & Oncology, P.A.*,
21 F.4th 1288 (11th Cir. 2021) ......................................................................54

*Zivkovic v. S. Cal. Edison Co.*,
302 F.3d 1080 (9th Cir. 2002) ......................................................................24

**Statutes**

12 U.S.C. § 5536(a)(1)(B) ..............................................................................11

12 U.S.C. § 5536(a)(3)...................................................................... 11, 34, 36

12 U.S.C. § 5561(5) .......................................................................................42

12 U.S.C. § 5565(a)(1).................................................................................. 1, 12

12 U.S.C. § 5565(a)(2)....................................................................................12

12 U.S.C. § 5565(c) ................................................................................ 12, 41

12 U.S.C. § 5565(c)(1)....................................................................................41

12 U.S.C. § 5565(c)(2)...................................................................... 12, 43, 48

12 U.S.C. § 5565(c)(2)(A) ....................................................................12

12 U.S.C. § 5565(c)(2)(B) ................................................................ 12, 41

12 U.S.C. § 5565(c)(2)(C) ................................................................ 12, 53

12 U.S.C. § 5565(c)(3)............................................................ 12, 42, 44, 49

12 U.S.C. § 5565(c)(3)(E)....................................................................51

28 U.S.C. § 1291 .....................................................................................1

28 U.S.C. § 1331 .....................................................................................1

28 U.S.C. § 1345 .....................................................................................1

28 U.S.C. § 1367 .....................................................................................1

Cal. Bus. & Prof. Code § 17200 .........................................................11

Cal. Bus. & Prof. Code § 17206 .........................................................13

Minn. Stat. § 8.31, subd. 3 ..................................................................13

Minn. Stat. § 325D.44..........................................................................11

Minn. Stat. § 325F.69, subd. 1 ............................................................11

Minn. Stat. § 645.24..............................................................................13

N.C. Gen. Stat. § 75-15.2.....................................................................13

N.C. Gen. Stat. § 75-1.1(a) ..................................................................11

N.C. Gen. Stat. §§ 14-423(2), 14-424, 14-425 ....................................11

**Rules**

Fed. R. App. P. 4(a)(1)(B) ...................................................................1

Fed. R. Civ. P. 16(b)(4)........................................................................23

**Regulations**


12 C.F.R. § 1083.1 (2023) .......... 12, 41, 53

16 C.F.R. § 310.3(a)(2)(iii), (x) .......... 10

16 C.F.R. § 310.3(b) .......... 11, 34, 43

16 C.F.R. § 310.4(a)(5)(i)(A)–(B) .......... 10

16 C.F.R. § 310.4(a)(5)(ii) .......... 8, 44

Telemarketing Sales Rule, Final Rule,
75 Fed. Reg. 48458 (Aug. 10, 2010) .......... 10

## GLOSSARY

| | |
|---|---|
| Br. | Defendant-Appellant Kaine Wen's Opening Brief, Dkt. No. 26-1 |
| Bureau | Plaintiff-Appellee Consumer Financial Protection Bureau |
| CAC | Defendant Consumer Advocacy Center, Inc. |
| CFPA | Consumer Financial Protection Act |
| CID | Civil Investigative Demand |
| Company | Consumer Advocacy Center, Inc., d/b/a Premier Student Loan Center (CAC); True Count Staffing Inc., d/b/a SL Account Management; Prime Consulting LLC; and TAS 2019 LLC d/b/a Trusted Account Services (TAS) |
| ER | Appellant's Excerpts of Record, Dkt. Nos. 27 & 28 |
| IDR | Income-driven repayment |
| SER | Plaintiffs' Supplemental Excerpts of Record |
| States | Plaintiffs-Appellees the State of Minnesota, the State of North Carolina, and the People of the State of California |
| TAS | Defendant TAS 2019, LLC |
| TSR | Telemarketing Sales Rule |

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this government enforcement action because it was "brought under Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presented a federal question, 28 U.S.C. § 1331, and was brought by an agency of the United States, the Consumer Financial Protection Bureau, *id.* § 1345, together with the states of Minnesota, North Carolina, and the People of the State of California. The court had supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. The court entered final judgment against Defendant Kaine Wen on July 7, 2023. 1-ER-2–37. Wen noticed an appeal on August 3, 2023. 7-ER 1511; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Did the district court abuse its discretion in denying Defendant Kaine Wen's motion to reopen discovery after he failed to conduct any discovery during the nearly fifteen-month discovery period and waited until one business day before his opposition to a motion for summary judgment was due to seek modification of the scheduling order?

2. Did the district court correctly find no genuine dispute of material fact as to Wen's liability for the period from November 2015 through June 2017, where the evidence showed he helped run an illegal and deceptive nationwide

telemarking scheme and was, at a minimum, recklessly indifferent toward or consciously avoided knowing of the scheme's illegal practices?

3. Before holding Wen jointly and severally liable to pay restitution to compensate harmed consumers, was the district court required to make factual findings about how much each of Wen's co-defendants had paid in restitution as of the date of the court's judgment?

4. Did the district court order an appropriate civil money penalty where it considered the required statutory factors, found no basis to order less than the full amount authorized by statute, and entered a penalty commensurate with the nearly $100 million in illegal fees that the Company took from struggling borrowers?

## PERTINENT STATUTES AND RULES

See attached statutory addendum.

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. The student loan debt relief enterprise

For years, Defendant-Appellant Kaine Wen and his co-defendants, Albert Kim and Tuong Nguyen, ran a bogus debt relief enterprise that bilked tens of thousands of student loan borrowers across the country out of tens of millions of dollars.

The enterprise operated primarily through several interrelated entities formed and run by Wen, Kim, and Nguyen: Consumer Advocacy Center, Inc. (CAC); True Count Staffing, Inc.; Prime Consulting, LLC; and TAS 2019, LLC (TAS) (collectively, the Company; together with Wen, Kim, and Nguyen, Defendants).[1] *See* 1-ER-39, 45. The Company misled consumers during telemarketing calls about its ability to lower their monthly loan payments or help them obtain loan forgiveness, all while collecting illegal upfront fees from those consumers and deceiving them about the purpose of the fees and the nature of the Company's services. *See* 1-ER-42–44.

The Company's scheme preyed upon consumers seeking to take advantage of various loan repayment and forgiveness programs offered by the U.S. Department of Education. Income-driven repayment (IDR) plans are one form of repayment plan offered by the Department of Education that may result in lower monthly payments for consumers and forgiveness of the balance of consumers' student loans after enough payments. 2-ER-276 (Undisputed Fact (UF) 51); 2-ER-278 (UF 56). An IDR plan bases a consumer's monthly payment on a percentage of their discretionary income after consideration of certain factors, including the consumer's income, family size, marital status, and tax-filing status. 2-ER-276 (UF

[1] Other companies and individuals were also named as defendants or relief defendants.

52). In addition, consumers struggling to pay their federal student loans can seek loan forbearance, during which the consumer owes no monthly payments. 2-ER-279–80 (UF 60).

The Company used lead generators to specifically target consumers struggling with student loan debt, then engaged in a telemarketing campaign to sell those struggling borrowers on the Company's debt relief program. 2-ER-280–81 (UF 61–62). During sales calls, the Company's sales representatives touted that they could help consumers both lower their monthly loan payments and obtain loan forgiveness. 2-ER-296–97 (UF 78); 2-ER-303–07 (UF 86–87). Sales representatives used high-pressure sales tactics to create a sense of urgency to lure consumers to enroll, indicating in some instances that the forgiveness programs would disappear if consumers did not enroll right away. 2-ER-283–84 (UF 69).

The Company's program, however, was a ruse. Unbeknownst to consumers, the Company in some cases submitted IDR applications on consumers' behalf that falsely inflated their family sizes, or misrepresented their marital statuses, to obtain artificially low monthly payments. 2-ER-315–320 (UF 99–103). In other cases, the Company submitted forbearance requests without consumers' consent. 2-ER-312–313 (UF 95–96). Although falsified IDR applications or forbearance may lower consumers' payments initially, they can also have negative consequences. *See* 2-ER-278 (UF 55). For example, consumers may accrue more interest because it

takes longer to pay off their loans. 2-ER-279–80 (UF 60); 2-ER-387–88 (UF 218). And in the case of falsified IDR applications, consumers may unexpectedly face higher payments when their monthly payment amounts are recalculated based on accurate information. *See* 1-ER-41. Similarly, though forbearance can temporarily help consumers by pausing their monthly payments, during the relevant period, consumers could only obtain forbearance for a cumulative total of three years, 2-ER-279–80 (UF 60), so if consumers entered forbearance unnecessarily, they may be unable to obtain further forbearances later when they really needed them.

For these "services," the Company typically charged two types of fees to consumers: an enrollment fee and a monthly fee. 2-ER-321 (UF 105). The fees varied over time, with enrollment fees ranging from approximately $799 to $1,899, 2-ER-321–22 (UF 106), and monthly fees ranging from approximately $10 to $50, 2-ER-326 (UF 114). The Company collected these fees before consumers made any payments on adjusted loan plans, including while consumers' loans were in forbearance. 2-ER-320–30 (UF 104–117).

Moreover, the Company often misrepresented what the fees went toward. In some cases, salespeople stated or implied that payments were going toward consumers' student loans, when in fact the Company kept the payments. In other cases, consumers were told that the fees were necessary to enroll into a loan forgiveness program, when in fact consumers could have enrolled in IDR programs

or obtained forbearance themselves for free. 2-ER-290–96 (UF 75–77); 2-ER-275 (UF 50).

All told, between November 2015 and October 2019—when the district court entered an injunction prohibiting further operations—the Company collected over $95 million in illegal fees from over 80,000 consumers and caused those consumers significant additional financial and emotional harms. 2-ER-386–3-ER-391 (UF 212–21).

### 2. Wen's role in the enterprise

Wen played a central role in the Company's enterprise from the beginning. Wen and Kim jointly and equally owned CAC beginning in August 2014. 2-ER-258 (UF 5); 1-SER-294. Wen also formed, either on his own or together with Kim, other entities involved in the enterprise. 2-ER-259 (UF 7); 2-ER-261–62 (UF 14–16); 2-ER-371 (UF 176). Wen provided $30,000 in capital to start CAC and contributed even more funds thereafter. 2-ER-259 (UF 6). He was identified as the chief financial officer on an agreement reflecting his and Kim's joint ownership of CAC, 1-SER-153, and he held himself out as the Company's general counsel since its inception, 1-SER-090; 1-SER-162.[2] In November 2015, Wen signed a debt relief merchant agreement on the Company's behalf, acknowledging both that the

[2] Wen was a licensed attorney in California from 2008 to 2021, when he was disbarred. 2-ER-351–52 (UF 149).

Company engaged in debt-relief services and that it was obligated to comply with various consumer protection laws, including the Telemarketing Sales Rule (TSR) and the Consumer Financial Protection Act (CFPA). 1-SER-171. In addition, Wen was an account signatory on several Company bank accounts, and he helped the Company set up and maintain merchant accounts—which enabled the Company to charge fees to consumers—including accounts active from 2015 through 2017. *See* 2-ER-349 (UF 143); 1-SER-218 (Heidari Decl. ¶¶ 9–10), 1-SER-224–27 (Heidari Decl. Appx. C, Appx. D). From the beginning, Wen communicated with Kim about budget issues and about Wen's work for the Company, and he specifically discussed the Company's fees during the period Wen refers to in his brief as "Period 1." *See* Br. at 20 n.3; *see also* 2-ER-346–47 (UF 140); 2-ER-348–49 (UF 142); 1-SER-95. During the same period, Wen received statements containing chargeback information and credit card disputes from the Company's payment processor. 2-ER-349–50 (UF 145); 1-SER-239–40 (Schneider Decl. ¶ 24).

Between November 2015 and June 2017, Wen also received, and in some instances responded on the Company's behalf to, consumer complaints, including complaints forwarded by government entities or the Better Business Bureau. 2-ER-363 (UF 166). For example, Wen was notified of complaints alleging that the Company inflated consumers' family size, that it misrepresented the amounts of consumers' monthly payments, and that it was charging upfront fees. 2-ER-358–59

(UF 158); 2-SER-299–312. Wen also received and responded to a consumer's complaint that she had been "scammed" because the Company inflated her family size on an IDR application and charged her for something she could have done on her own for free. 2-SER-313–21.

In an effort to obfuscate the Company's illegal conduct, Wen agreed that the Company should use numerous fictitious names to help dilute the number of complaints against it, and he engaged a reputation management company to deal with negative online reviews. 2-ER-361–62 (UF 161–63). Wen also was aware of the Company's high chargeback rates, 2-ER-342–43 (UF 135); 2-ER-362 (UF 164), and knew that the Company took steps to try to keep chargeback rates down specifically to avoid law enforcement scrutiny, 2-ER-343–44 (UF 137).

By his own admission, by mid-2017, Wen was even more heavily involved in the Company. 2-ER-204–05 (Wen Decl. ¶¶ 67–69). Wen later took the lead in forming TAS to serve as a dedicated account provider, i.e., a purportedly independent third party that would collect consumers' payments. 2-ER-371–74 (UF 176–85). As a dedicated account provider, TAS was supposed to be genuinely independent of the debt-relief provider and to collect funds from consumers that could be used to make payments to consumers' creditors. *See* 16 C.F.R. § 310.4(a)(5)(ii). Instead, Wen asked his long-time family friend—who had no prior experience in the industry—to operate TAS. 2-ER-371–73 (UF 178–79). And

throughout its operation, neither TAS nor the rest of the Company ever made payments to creditors on behalf of consumers. 2-ER-331–32 (UF 119).

When regulatory scrutiny on the Company increased in 2018 and it received civil investigative demands (CIDs) from the Minnesota Attorney General's Office and then the Bureau, 2-ER-379 (UF 196–97), Wen recommended that the Company work with outside counsel, 2-ER-207–08 (Wen Decl. ¶ 77). Wen wrote to outside counsel, acknowledging that the Company was processing payments for approximately 37,000 current customers and stating that, "All clients are 'paying upfront fees'. There is no way to be retroactively compliant." 2-ER-365–66 (UF 169).

After the Company received the Bureau's CID, and against the advice of counsel, Wen and Kim agreed to delete all emails contained in one of the Company's main email domains. 2-ER-380–82 (UF 200–01). Later, after the district court entered an injunction halting the Company's illegal activities, Wen deleted his text message communications through various instant messaging applications. 2-ER-384 (UF 205–06). The deleted text messages dated back to at least November 2015.[3] 2-ER-384 (UF 207).

[3] Wen states that the decision to delete emails was made after consulting with counsel and was based on a misunderstanding regarding counsel's advice. 2-ER-380–81 (UF 200). But he does not dispute that he and Kim agreed to delete the emails, nor does he even try to explain an email from outside counsel stating: "My

## B. Statutory and Regulatory Background

The TSR is an important consumer protection regulation that was promulgated by the Federal Trade Commission to, among other things, "curb deceptive and abusive practices occurring in the telemarketing of debt relief services." Telemarketing Sales Rule, 75 Fed. Reg. 48458, 48506 (Aug. 10, 2010). As relevant here, it prohibits providers of telemarketed debt relief services from collecting fees until the provider has: (a) "renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by" a consumer; and (b) the consumer "has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement." 16 C.F.R. § 310.4(a)(5)(i)(A)–(B). This provision is often referred to as the TSR's advance fee ban. *See* 75 Fed. Reg. at 48465.

Both the TSR and the CFPA prohibit certain persons and entities from engaging in deceptive acts or practices. *See* 16 C.F.R. § 310.3(a)(2)(iii), (x) (prohibiting sellers and telemarketers from misrepresenting material aspects of the efficacy of their services or any other material aspect of a debt-relief service); 12

---

major concern is that the emails were deleted, which we advised you not to do." 2-SER-323. With respect to the deleted text messages, though Wen claims to dispute that he deleted them, 2-ER-384 (UF 205), his declaration notably does not deny that he did so, and he has cited no other evidence countering that fact.

U.S.C. § 5536(a)(1)(B) (prohibiting covered persons from, among other things, engaging in deceptive acts or practices).

In addition, the TSR and the CFPA both prohibit substantially assisting certain violations of those laws. Specifically, the TSR prohibits any person from providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates," among other things, the TSR's advance fee ban. 16 C.F.R. § 310.3(b). The CFPA, in turn, prohibits any person from "knowingly or recklessly provid[ing] substantial assistance to a covered person … in violation of" the CFPA's prohibition on deceptive acts or practices. 12 U.S.C. § 5536(a)(3).

Like the TSR and the CFPA, the laws of Minnesota, North Carolina, and California also prohibit deceptive, fraudulent, or unfair business practices. *See* Minn. Stat. § 325F.69, subd. 1; Minn. Stat. § 325D.44; N.C. Gen. Stat. § 75-1.1(a); Cal. Bus. & Prof. Code § 17200. In addition, North Carolina law, like the TSR, prohibits charging advance fees for engaging in "debt adjusting," which North Carolina law defines as "the business or practice … of reducing, settling, or altering the terms of the payment of any debt." N.C. Gen. Stat. § 14-423(2), *see also id.* §§ 14-424, 14-425.

The CFPA provides a broad range of relief for violations of federal consumer financial law, authorizing courts to "grant any appropriate legal or equitable relief with respect to [such] a violation[.]" 12 U.S.C. § 5565(a)(1). Such relief may include, "without limitation," remedies such as restitution, money refunds, disgorgement, damages, and civil money penalties. *Id.* § 5565(a)(2).

The CFPA sets forth a detailed framework for determining the amount of any civil penalty. *See id.* § 5565(c). First, it establishes three tiers of maximum civil penalties based on the defendant's mental state. *Id.* § 5565(c)(2). Under the "[f]irst tier," a civil penalty "may not exceed" $6,813 "for each day during which such violation … continues." *Id.* § 5565(c)(2)(A); *see also* 12 C.F.R. § 1083.1 (2023) (adjusting penalty amounts for inflation). The second tier establishes a per-day maximum of $34,065 for "reckless[]" violations. 12 U.S.C. § 5565(c)(2)(B); 12 C.F.R. § 1083.1 (2023). And the third tier establishes a per-day maximum of $1,362,567 for "knowing[]" violations. 12 U.S.C. § 5565(c)(2)(C); 12 C.F.R. § 1083.1 (2023). Next, the CFPA instructs courts, in determining the appropriate penalty amount, to account for various factors, namely: "(A) the size of financial resources and good faith of the person charged; (B) the gravity of the violation … ; (C) the severity of the risks to or losses of the consumer … ; (D) the history of previous violations; and (E) such other matters as justice may require." *Id.* § 5565(c)(3).

The laws of Minnesota, North Carolina, and California similarly allow for the imposition of civil penalties for each violation of their relative statutes. *See* Minn. Stat. § 8.31, subd. 3; Minn. Stat. § 645.24; N.C. Gen. Stat. § 75-15.2; Cal. Bus. & Prof. Code § 17206.

### C. Proceedings and Decision Below

#### 1. Plaintiffs' initiation of this action

The Bureau, together with the states of Minnesota, North Carolina, and the People of the State of California (together, the States), brought this enforcement action in October 2019 to stop Defendants' illegal conduct and to obtain civil penalties and relief for consumers. 2-SER-488–539. Plaintiffs asserted violations of the TSR and the CFPA, as well as violations of Minnesota, North Carolina, and California laws. 8-ER-1610–86. Plaintiffs also moved ex parte for a temporary restraining order that would, among other things, freeze Defendants' assets, appoint a receiver to run the business, and bar Defendants from collecting advance fees and from making certain misrepresentations.

The district court granted the temporary restraining order and appointed a receiver for the Company. 8-ER-1728; 8-ER-1746. Defendants later stipulated to the entry of a preliminary injunction. 6-ER-1433.

### 2. Wen's failure to comply with the asset freeze and contempt order

The temporary restraining order and preliminary injunction prohibited Wen from dissipating assets. 8-ER-1738–39; 6-ER-1444–45. They further required Wen to complete a sworn financial statement detailing, among other things, his income, assets, and debts—including requiring that he identify all "cryptocurrency and other virtual currencies" he held—as well as all payments, transfers, or assignments of any assets he made since 2015 worth $5,000 or more. 8-ER-1743, 1790; 6-ER-1450. In executing the financial statement, Wen represented that he owned no cryptocurrency or other virtual currency assets. 4-ER-894.

Over a year later, and after several follow-up requests from the Bureau regarding inconsistencies in Wen's financial disclosures, *see* 4-ER-915–21, Wen provided an amended financial disclosure, 4-ER-923–47. In the amended disclosure, Wen acknowledged for the first time that, from 2017 to 2018, his investments included "Various Initial Coin Offerings"—the cryptocurrency industry's equivalent to an initial public offering. *See* 4-ER-782. He also disclosed that his assets included certain cryptocurrency valued at approximately $640,000 as of November 2019. *See* 4-ER-782.

When the Bureau served Wen with discovery regarding his virtual currency assets and transfers, he objected on Fifth Amendment grounds. 5-ER-981–86. The Bureau then moved for an order to show cause why Wen should not be held in

contempt. *See* 8-ER-1724–27; 4-ER-779, 782–83. The district court granted the motion in part and ordered Wen to provide the Bureau with detailed cryptocurrency ownership and transfer information. 6-ER-1266–75. Wen invoked the Fifth Amendment privilege against self-incrimination and declined to respond to any topic that the court's disclosure order required him to address. 4-ER-953–54.

The Bureau then retained an expert to trace Wen's cryptocurrency holdings and transactions. *See* 4-ER-784. The expert's findings showed that Wen most likely controlled a significant amount of cryptocurrency that Wen did not disclose to Plaintiffs. *See* 4-ER-784. Specifically, based on the expert's findings, Wen most likely controlled over $[redacted] in various undisclosed virtual currencies as of October 2019, and he most likely transferred or dissipated [redacted] worth of cryptocurrency through hundreds of transactions thereafter. *See* 3-SER-547–48, 588–90 (Clegg Decl. ¶¶ 15–18, App. E, Figure E-1); 3-SER-632–35, 647–48 (Ridder Decl. ¶¶ 36–42, Apps. D, E). The expert further found that, as of March 2022, Wen likely still controlled two different forms of virtual currencies valued at a combined $[redacted], much of which he had never disclosed to Plaintiffs.[4] 3-SER-547 (Clegg Decl. ¶ 16); 3-SER-633, 643–46 (Ridder Decl. ¶ 37, App. C).

---

[4] The Bureau estimates that the value of the virtual currency assets Wen held as of March 2022 that he has failed to turn over to the receiver is at least $[redacted], based on the publicly reported price of those assets on October 20, 2024.

The Bureau renewed its contempt motion, which the district court granted, finding that the Bureau presented clear and convincing evidence that Wen failed to disclose his cryptocurrency assets to Plaintiffs and that Wen dissipated assets in violation of prior orders. 4-ER-779–91. In addressing Wen's arguments in opposition, the court noted that Wen failed to give any details regarding any attempts to comply with the court's prior orders or explain why he could not direct someone to comply on his behalf. 4-ER-789. After holding a show cause hearing, the court issued an order holding Wen in civil contempt. 2-SER-326–37. Wen has yet to purge that contempt. *See* 1-SER-4.

**3. Wen's conduct during discovery**

Discovery opened on September 10, 2021. At the time, Wen was represented by counsel who participated in the discovery conference required by Federal Rule of Civil Procedure 26(f). In the parties' joint Rule 26(f) report, both Plaintiffs and Wen identified Kim and Nguyen as potential witnesses, 2-SER-413–16, and, with respect to damages, Wen stated that "any award [against him] … must be offset by … amounts already paid in settlement or otherwise by other Defendants or third parties," 2-SER-419.

Wen entered federal custody in September 2021, but, through his counsel, he served his initial disclosures on Plaintiffs the following month. 1-SER-126–32. Wen's initial disclosures also identified Kim and Nguyen, among others, as

potential witnesses. 1-SER-128. In January 2022, the Bureau sent Wen, through his counsel, Nguyen's declaration. *See* 1-ER-70.

Wen's counsel withdrew in May 2022. 4-ER-836. In August 2022, Wen was transferred to a reentry facility, where he claims to have had limited access to a cell phone and internet. *See* 1-ER-70. Wen nevertheless later served responses to Plaintiffs' Requests for Admissions. 1-SER-176–212; *see also* 2-SER-347–403 (motion and order compelling Wen's responses to discovery). At the same time, the Bureau produced to him Kim's declaration. *See* 1-ER-71.

#### 4. The district court's denial of Wen's motion to reopen discovery and grant of Plaintiffs' motion for summary judgment

In December 2022, Plaintiffs notified Wen of their anticipated motion for summary judgment. 3-ER-464 (Stewart Decl. ¶ 24). Wen was released from custody later that month. *See* Br. at 17. Plaintiffs met and conferred with Wen about the motion following his release, in January 2023. 3-ER-464 (Stewart Decl. ¶ 27). Plaintiffs moved for summary judgment on January 30. 3-ER-512–16. In mid-February, the parties communicated on multiple occasions about extending the deadlines for Wen's opposition to the motion and other pre-trial and trial dates. 3-ER-464–65 (Stewart Decl. ¶¶ 29–32). But it was not until February 21 that Wen indicated for the first time that he wanted to reopen discovery—only six days before his February 27 deadline to oppose Plaintiffs' motion. 3-ER-465 (Stewart Decl. ¶ 33). After Plaintiffs informed Wen that they opposed his request, Wen

moved to reopen discovery on February 24, just one business day before his deadline to oppose Plaintiffs' motion. 3-ER-479–88.

In denying Wen's motion, the district court explained that Wen had not acted diligently in pursuing discovery, including during the eight months of discovery that he was represented by counsel. 1-ER-73–74. The court further noted that Wen had "shown that he has been able to communicate with the Court and relevant parties in the months before or immediately after the discovery cut-off, and yet he did not seek an extension of the discovery cutoff" until the eve of his deadline to oppose Plaintiffs' summary judgment motion. 1-ER-74. The court did, however, grant Wen more time to file his opposition. 1-ER-75.

The court granted Plaintiffs' motion for summary judgment. In its order, the court noted that Wen did not meaningfully dispute that the Company violated the TSR and the CFPA. 1-ER-51. Instead, Wen's principal argument was that there were genuine issues of material fact over whether he should be held individually liable for those violations. 1-ER-51.

In evaluating Wen's individual liability, the court separately assessed Wen's involvement in, and knowledge of, the Company's conduct before and after June 2017. For the period up to and including June 2017, the court relied on, among other undisputed facts: (1) Wen's position as the Company's chief financial officer and its general counsel since at least 2015; (2) the fact that Wen was an account

signatory for accounts in the Company's name; (3) Wen's responsibility for handling consumer complaints and inquiries from law enforcement; and (4) Wen's regular communications with Kim about the Company's services and budget. 1-ER-52–53. The court concluded that the undisputed evidence established that Wen had sufficient control and knowledge of the Company's practices to be directly liable for violating the TSR and CFPA, and that the same evidence established that Wen provided substantial assistance and support to the Company's violations. 1-ER-52–54.

For the period after June 2017, the court noted that Wen did not meaningfully dispute his involvement in the Company or that he was recklessly indifferent to the Company's illegal activity. 1-ER-54–55. The court, therefore, also found that there were no genuine disputes of material fact as to Wen's liability for violating the TSR and CFPA, both directly and as a substantial assistor, for the period after June 2017. 1-ER-54–56.

Finally, the court determined that the same undisputed facts that established Wen's liability under the TSR and the CFPA also established his liability for violations of Minnesota, North Carolina, and California law. 1-ER-56–57.

Having found that the uncontested evidence established Wen's liability, the court went on to consider the appropriate remedies. The court held Wen jointly and severally liable to pay just over $95 million in restitution, representing the total

amount of illegal fees the Company collected from consumers between 2015 and 2019, less refunds already issued. 1-ER-61–64. In its order, the court noted that "[a]ny amount contributed as restitution by other defendants will reduce [Wen's] total liability by the same amount." 1-ER-64. In its final judgment against Wen, the court provided that the judgment of monetary relief entered against Wen was joint and several. 1-ER-21 (Final Judgment ¶ 65). The final judgment further ordered Wen to turn over certain assets, including cryptocurrency and other virtual assets. 1-ER-21–23 (Final Judgment ¶ 67).

The court calculated penalties based on three independent violations per day,[5] which the court determined continued for 1,449 days—i.e., from November 5, 2015 through October 23, 2019. 1-ER-57, 59. Based on Wen's "recklessness in violating the law," 1-ER-59, the court applied tier-two penalties, for a total statutory maximum just over $148 million, 1-ER-57–61. The court determined that the statutory factors warranted such a penalty. 1-ER-60.

#### 5. The receiver's post-judgment motion for order to show cause why Wen should not be held in contempt

Following the entry of judgment, the receiver attempted to contact Wen on multiple occasions to coordinate the turnover of Wen's assets. *See* 2-ER-153–54.

[5] These were: (1) violation of the TSR through collection of enrollment fees; (2) violation of the TSR through collection of monthly recertification fees; and (3) deceptive conduct in violation of the TSR. *See* 1-ER-57.

After Wen failed to respond, the receiver filed a motion for an order to show cause why Wen should not be held in contempt. 1-SER-25–48. Wen opposed the motion, claiming, among other things, that he could not comply with the final judgment because he claimed he did not "own, hold, or control" the virtual currency assets. 2-ER-103–04 (Wen Decl. ¶ 21). But beyond his own self-serving declaration disclaiming his ownership of or control over such assets, Wen has never described any transfers of the relevant virtual currency he held, after asserting his Fifth Amendment privilege against self-incrimination regarding the district court's orders that he disclose any payments, transfers, or assignments of assets worth $5,000 or more. *See* 4-ER-710 (Wen Resp. to Jan. 6, 2023 Order ¶ 6). The receiver's motion remains pending in the district court.

## SUMMARY OF ARGUMENT

**1.** The district court acted well within its discretion in declining to modify the scheduling order to reopen discovery because Wen was not diligent during the nearly fifteen-month discovery period. While Wen claimed to need more time for discovery on certain issues, Wen had identified all of those issues at the very outset of discovery, but he never propounded discovery relating to any of them. Wen's only excuse for that failure is that his incarceration limited his ability to do so. But his incarceration did not prevent his counsel from seeking discovery on his behalf during the first eight months of the discovery period, nor did it stop Wen from

communicating with Plaintiffs and the court, including about discovery, once he was self-represented. It also does not explain his decision to wait until the eve of his deadline to oppose a summary judgment motion to seek additional time for discovery.

**2.** The district court correctly determined on summary judgment that there was no genuine dispute of material fact regarding Wen's liability between November 2015 and June 2017. The undisputed evidence established both that Wen had the authority to control the Company since its inception and that he was at least recklessly indifferent toward, or consciously avoided knowing of, the Company's illicit practices. Wen's declaration characterizing his involvement as "minimal" during that period did not create a genuine dispute in the face of specific, undisputed facts establishing his liability.

**3.** The district court, in holding Wen jointly and severally liable for the full amount of restitution required to compensate harmed consumers for the illegal fees they paid, was not required to first determine what Wen's co-defendants had paid toward that restitution amount to-date and hold Wen liable only for the remainder. Under basic principles of joint and several liability, Wen is not liable to Plaintiffs for amounts his co-defendants pay toward the restitution award—as the district court expressly noted in its summary judgment decision. Wen's continued confusion on this point provides no grounds for setting aside the restitution award.

**4.** The district court correctly ordered Wen to pay a penalty commensurate with his illegal conduct and consistent with the CFPA. Wen's arguments challenging the district court's penalty calculation are incorrect, and there was no genuine dispute as to any of the facts relevant to the court's penalty analysis. Nor is the penalty ordered constitutionally excessive; it is merely proportional to the extremity of Wen's violations.

## ARGUMENT

### I. The district court acted well within its discretion in declining to modify the scheduling order to reopen discovery.

A scheduling order may be modified "only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Under that standard, the district court will modify a scheduling order only where the moving party shows that it could not reasonably meet the deadline imposed, despite that party's diligence. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992) ("If th[e] party [seeking modification] was not diligent, the inquiry should end."). The standard under Rule 56(d) is similar: before a party opposing summary judgment will be allowed additional time to take discovery to oppose the motion, the party must show that they have "diligently pursued previous discovery opportunities." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1026 (9th Cir. 2006). Under either Rule 16 or Rule 56, on appeal, this Court reviews a district court's

denial of a motion to reopen discovery for abuse of discretion. *Id.*; *see also Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087–88 (9th Cir. 2002).

Here, Wen did not demonstrate good cause to modify the scheduling order because he did not diligently pursue discovery before the deadline. The district court therefore acted well within its discretion in denying Wen's motion.

Wen claims he needed the additional discovery to depose Kim and Nguyen and to learn the value of assets collected by Plaintiffs or the receiver from other parties. As an initial matter, and as discussed below, *see* Sec. III, the amounts collected from other parties had no bearing on the district court's summary judgment decision. Wen therefore could not hope to establish that the court abused its discretion by not modifying the scheduling order to allow for discovery on this irrelevant topic.

But even setting that aside, Wen indicated from the beginning that he believed Kim and Nguyen's testimony would be relevant, as would the amounts paid by other defendants. Wen identified Kim and Nguyen as potential witnesses at the outset of discovery and argued that any damages remedy should be offset by amounts paid in settlement by other parties. 1-SER-128; 1-SER-131; 2-SER-416; 2-SER-419. Yet Wen sought no discovery during the entire fifteen-month discovery period.

Wen's only explanation for failing to serve any discovery is that his incarceration limited his ability to do so. But for more than half of the discovery period, Wen was represented by counsel who could have served discovery on his behalf. And even once Wen—who was a licensed attorney for over a decade and was listed as the Company's general counsel—was self-represented, he demonstrated his ability to communicate with the court and with Plaintiffs in the months before and immediately after the discovery cutoff. Indeed, he provided responses to discovery requests in October 2022—two months before the discovery cutoff—while he was self-represented.[6] *See* 1-SER-176–212.

Moreover, despite being in touch with counsel for Plaintiffs and the court multiple times before and immediately after the discovery deadline, Wen did not raise the need to conduct additional discovery with Plaintiffs until February 21, 2023—nearly 2 months after the discovery cutoff and his release from incarceration, and only 6 days before his deadline to respond to Plaintiffs' motion for summary judgment. He then filed his motion to reopen discovery only one business day before his summary judgment opposition was due. Wen offers no justification for waiting until the eleventh hour to seek additional time to conduct

[6] Wen also argues (at 27 n.4) that he had no reason to anticipate that Kim might testify against him, but he does not dispute that he was served with Kim's declaration two months before the discovery cutoff. He had plenty of time to seek to depose Kim before the close of discovery or seek additional time to do so.

discovery.[7] *See Cyntegra, Inc. v. IDEXX Lab'ys, Inc.*, 322 F. App'x 569, 572 (9th Cir. 2009) (affirming denial of motion to continue hearing on summary judgment where party "was not diligent in pursuing discovery, seeking a continuance, or seeking modification of the scheduling order").

Wen's pro se status during the latter part of the discovery period does not absolve him of abiding by the federal rules. *See Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (rule that courts should liberally construe filings from pro se incarcerated litigants "exempts pro se inmates from *strict* compliance with the summary judgment rules, but it does not exempt them from *all* compliance") (emphasis in original). This Court has repeatedly affirmed the denial of motions to modify scheduling orders where litigants failed to satisfy the good cause standard, including where the litigants were unrepresented.[8] *See, e.g.*, *Manning v. Dep't of Veterans Affs.*, No. 21-15501, 2022 WL 1714292, at *1 (9th Cir. May 27, 2022);

---

[7] Wen claimed (at 22) he never received Nguyen's declaration until he received Plaintiffs' motion for summary judgment. Again, Wen identified Nguyen as a witness at the outset of discovery and did nothing to obtain discovery from him. But even assuming Wen did not appreciate his need to obtain Nguyen's testimony until his receipt of Plaintiffs' motion, that need should have been obvious as soon as he received the motion. Wen could have raised the issue with Plaintiffs during one of the many communications he had with them after their motion was filed. Instead, he waited nearly a month to raise it for the first time.

[8] *Rand v. Roland*, 154 F.3d 952 (9th Cir. 1998), cited by Wen (at 26), is inapposite. That case involves the need to provide notice of Rule 56's requirements to incarcerated pro se litigants. *See id.* at 958–59. The district court here issued an order specifically advising Wen of the rule's requirements. 2-SER-338–46.

*Ross v. White*, No. 19-55900, 2022 WL 543201, at *1 (9th Cir. Feb. 23, 2022). Nor should Wen—who, again, was a licensed attorney for more than a decade—be afforded the same latitude that might be appropriate for other pro se litigants. *Cf. Huffman v. Lindgren*, 81 F.4th 1016, 1021 (9th Cir. 2023) ("There is a good reason that we afford leeway to pro se parties, who appear … without the benefit of sophisticated representation[.] … That logic does not apply to practicing attorneys, nor should the grace extend to them.").

Because Wen did not establish good cause to amend the scheduling order and reopen discovery, the district court did not abuse its discretion in denying his motion.[9]

## II. The district court correctly found no genuine dispute of material fact as to Wen's liability between November 2015-June 2017.

The district court also correctly found at summary judgment that there was no genuine dispute of material fact as to Wen's liability. As described below, the undisputed evidence established that Wen was directly liable for the Company's

---

[9] In a Rule 28(j) letter, Dkt. No. 29, Wen suggests for the first time that the denial of his motion to reopen discovery violated due process. The Court, however, ordinarily will not consider "an issue raised for the first time in a letter of supplemental authorities under Fed. R. App. 28(j)." *Kilpatrick v. Kijakazi*, 35 F.4th 1187, 1195 n.1 (9th Cir. 2022) (brackets omitted). And even if the Court were to consider the issue, Wen's letter fails to offer any argument beyond suggesting that he was entitled to "the regular course of trial proceedings." Dkt. No 29 at 2 (quoting *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024)). As explained above, Wen received exactly that.

violations, and Wen fails to identify any error in the court's analysis. Even if he had, the amount of the judgment against Wen would not change because he also violated the TSR and the CFPA by substantially assisting the Company's violations. Finally, the district court correctly entered summary judgment on the States' claims.

"Summary judgment is warranted when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Kama v. Mayorkas*, 107 F.4th 1054, 1058 (9th Cir. 2024) (internal quotation marks and citations omitted). This Court reviews summary judgment rulings de novo. *See Cottonwood Env't L. Ctr. v. Edwards*, 86 F.4th 1255, 1260 (9th Cir. 2023).

**1.** To hold Wen directly liable for the Company's violations, Plaintiffs had to establish that Wen "(1) … participated directly in the [violations] or had the authority to control them and (2) … had knowledge of the [violations], was recklessly indifferent to [them], or was aware of a high probability of [them]." *CFPB v. CashCall, Inc.*, 35 F.4th 734, 749 (9th Cir. 2022). Wen does not dispute that this standard applies, and he does not challenge the court's finding that he was liable for the period after June 2017.

Instead, Wen claims only that the district court erred in finding no genuine dispute of material fact as to his liability from November 2015 up to and including June 2017. But the district court correctly found that the undisputed facts showed

for this period both that (1) Wen had the authority to control the Company's conduct and (2) he was at least recklessly indifferent to the violations or was aware of a high probability of them.

First, the undisputed facts were sufficient to show that Wen exercised control over the Company dating back to its inception. As described above, *see* pages 6–8, Wen helped form and partially owned the entities involved in the scheme, and he was the Company's general counsel and chief financial officer since at least November 2015. *See, e.g.*, 1-SER-90; 1-SER-153. He also signed documents and entered into agreements on behalf of the Company, including agreements to establish the Company's merchant accounts, which were essential to enabling the Company to collect payments from consumers. 2-ER-349 (UF 143); 1-SER-160–75; 1-SER-218 (Heidari Decl. ¶ 10); 1-SER-226–27 (Heidari Decl. App. D). And he responded to consumer complaints on the Company's behalf. *See* 2-ER-363 (UF 166), 2-SER-316–17.

Given his role in the Company and his ability to speak and sign documents on its behalf, Wen undoubtedly had the ability to control its acts and practices. *See, e.g.*, *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) (Defendant's "role of president … and her authority to sign documents on behalf of the corporation demonstrate that she had the requisite control over the corporation."); *FTC v. Ivy Cap., Inc.*, 616 F. App'x 360, 361 (9th Cir. 2015)

(affirming summary judgment finding that individual defendant had ability to control corporation where he was its owner and founder, had the authority to sign contracts on its behalf, was a signatory for multiple company accounts, and provided consulting services and start up resources to the company).

Second, the undisputed facts showed that Wen was at least recklessly indifferent to, or aware of a high probability of, the Company's illegal conduct. The Company's collection of fees at enrollment and on a monthly basis thereafter was not a minor detail of its operations; it was a central and obvious feature of the Company's business model. After all, Wen was the Company's general counsel, and he signed an agreement in November 2015 acknowledging the Company was engaged in debt relief services and that it must comply with the TSR and the CFPA. 1-SER-171. Yet he took no steps to ensure the Company did so.

Beyond that, Wen was aware of the Company's fees and was informed of the Company's submission of inaccurate family sizes on IDR applications during the relevant period. 2-ER-353–54 (UF 154); 1-SER-95; 2-SER-299–321. Indeed, he received and responded to consumer complaints that detailed such conduct during that period. *See* pages 7–8, *supra*; *see also FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1141 (9th Cir. 2010) (failure to undertake "even modest due diligence" in the face of receipt of customer complaints demonstrates reckless indifference supporting finding of individual liability). He also received reports of

the Company's chargeback rates, 2-ER-349–50 (UF 145), and knew that the Company took steps to try to keep chargeback rates down to avoid law enforcement scrutiny, 2-ER-342–43 (UF 135–37), 2-ER-362 (UF 164).

In short, the undisputed evidence shows that "[t]here were myriad red flags that would have led a reasonable person to suspect that something was amiss" with the Company's practices during Period 1. *Ivy Cap.*, 616 F. App'x at 361. And of course, all this evidence is only what remains after Wen deleted emails and text messages going back to 2015. 2-ER-380–84 (UF 200–07).

In the face of this undisputed evidence concerning Wen's control over, and at minimum his reckless indifference to, the Company's violations, the district court correctly concluded that there was no genuine dispute that Wen was directly liable for those violations.

**2.** Wen identifies no error in this analysis. Though Wen (at 23) takes issue with Plaintiffs' reliance on the Kim and Nguyen declarations, Wen ignores both the plethora of documentary and other evidence that supported the motion—the Kim and Nguyen declarations were only two out of Plaintiffs' 93 exhibits, *see* 3-ER 521–29—and the fact that his declaration did not meaningfully contradict many of the material facts established by Kim's and Nguyen's declarations.

Notably, several facts supported by the Kim and Nguyen declarations went wholly undisputed by Wen, including that Wen was an account signatory for

multiple merchant accounts used by the Company, 2-ER-349 (UF 143), and that he responded to consumer complaints and law enforcement inquiries, 2-ER-363 (UF 166). When he did purport to dispute certain facts regarding the Company's conduct or his knowledge or involvement, Wen often did so only partially, or he disputed immaterial facts. For instance, Wen purported to dispute several facts regarding the Company's conduct only insofar as Plaintiffs contended that those facts occurred "in every case" or with respect to all the Company's customers. *See, e.g.*, 2-ER-281–82 (UF 64), 2-ER-317–18 (UF 100). Similarly, Wen disputed whether he "agreed" to the Company's practice of inflating consumers' family sizes on IDR applications, but his own declaration indicates that Kim had informed him of the conduct. 2-ER-354–55 (UF 155); 2-ER-216 (Wen Decl. ¶ 125). Having failed to dispute many of the facts established by the Kim and Nguyen declarations, Wen cannot now credibly claim on appeal that his declaration "paint[ed] an entirely different picture," *see* Br. at 33, of the material facts. *See Perez v. City of Fresno*, 98 F.4th 919, 923 n.1 (9th Cir. 2024) (affirming summary judgment where factual disputes nonmovant raised were not "over facts that might affect the outcome of the suit") (internal quotation marks and citation omitted).

Wen nevertheless lists a series of facts supported by the Kim and Nguyen declarations that he claims were genuinely disputed. Br. at 29. But the court did not rely on any of these purportedly disputed facts to conclude that Wen was

individually liable for the violations up to and including June 2017.[10] *See* 1-ER-52–54; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary" are insufficient to defeat summary judgment.).

Wen also argues that the court inappropriately disregarded his declaration, but the only aspect of Wen's declaration the court did not credit when it analyzed his individual liability was Wen's general characterization of his involvement in, and knowledge of, the Company's practices as "minimal" during the relevant period. *See* 1-ER-53–54. Disregarding Wen's broad characterization of his role and knowledge was appropriate considering it did not square with the specific and undisputed facts that established both his involvement in the Company (including his role as the Company's general counsel and his role in obtaining the Company's merchant accounts) and his awareness of its practices (including through his receipt of consumers complaints and other information about the Company's conduct). *See CFPB v. Gordon*, 819 F.3d 1179, 1193–94 (9th Cir. 2016) (affirming

---

[10] Wen argues (at 30) that he disputed the frequency of his conversations with Kim. In its analysis, the court referenced that Wen "regularly communicated with Kim about CAC services and budget issues beginning in 2015." 1-ER-53. In his declaration, however, Wen stated that during the relevant period: "I occasionally communicated with Kim about the … [b]usiness … regarding budget concerns or minor support work I provided to the business." 2-ER-202 (Wen Decl. ¶ 56). Whether Wen communicated with Kim "regularly" or only "occasionally" is not material to his liability.

grant of summary judgment on individual liability and emphasizing that a "conclusory, self-serving affidavit is insufficient to raise a triable issue of fact") (internal quotation marks and citation omitted).

**3.** Even if the evidence had been insufficient to establish that Wen was directly liable for the Company's violations (and it was more than sufficient), Wen would still be liable in the same amount for having provided substantial assistance to the Company's illegal conduct in violation of both the TSR and the CFPA. *See* 16 C.F.R. § 310.3(b); 12 U.S.C. § 5536(a)(3). Those substantial assistance violations are themselves enough to support the very same monetary award that the district court ordered. Thus, even if the Court concludes there is a genuine dispute of material fact concerning Wen's direct liability for the Company's violations, it should affirm the same remedial award on the basis of Wen's substantial assistance violations.

The threshold for substantial assistance under both laws is low, requiring only that the assistance have been something more than "mere 'casual or incidental' assistance" to the Company. *CFPB v. Nesheiwat*, No. 21-56052, 2022 WL 17958636, at *1 (9th Cir. Dec. 27, 2022) (quoting *FTC v. Chapman*, 714 F.3d 1211, 1216–17 (10th Cir. 2013)). Wen's setting up of the Company's merchant accounts—which were essential to enabling the Company to collect illegal advance fees—combined with his role serving as the Company's general counsel and chief

financial officer, and his assistance with budget issues, is more than enough to meet that low threshold. *See FTC v. HES Merch. Servs. Co. Inc.*, No. 12-1618, 2016 WL 10880223, at *5 (M.D. Fla. Oct. 26, 2016) (provision of merchant accounts constituted substantial assistance because accounts were "essential to the success of the scheme, and absent these merchant accounts, the … Defendants would have been unable to process credit card payments[.]"), *aff'd sub nom. FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234 (11th Cir. 2017).

And, as above, Wen's involvement in reviewing and responding to consumer complaints is alone sufficient to establish that he knew or consciously avoided knowing of the Company's conduct, particularly when coupled with his awareness of the Company's other practices. *See Chapman*, 714 F.3d at 1219 ("[T]aking deliberate steps to ensure one's own ignorance of a seller or telemarketer's [TSR] violations is an ineffective strategy to avoid liability.") (internal quotation marks and citation omitted).

Because the evidence was sufficient to establish Wen's liability for substantially assisting the primary violations, the district court's restitution order could remain unchanged even if this Court determined the evidence was insufficient to establish Wen's direct liability. This is so because substantial assistors may be held jointly and severally liable for harm caused by those who directly violate the TSR or the CFPA. *See WV Universal Mgmt.*, 877 F.3d at 1240

("[V]iolation of the TSR's substantial assistance rule can support joint and several liability…."); 12 U.S.C. § 5536(a)(3) ("[T]he provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided."). Similarly, the district court's penalty analysis would remain unchanged, as Wen's liability for substantially assisting the primary violations would still amount to three separate ongoing violations. *See* 3-ER-665 n.8 (noting that Plaintiffs excluded the substantial assistance violations when calculating the penalty).

**4.** Finally, there was nothing improper in the district court's conclusion that the same facts that supported Wen's liability for violations of the TSR and CFPA also established the elements of the similar state law claims.

First, Wen doubly forfeited this issue by failing to raise any dispute regarding the state law claims in his summary judgment briefing, *see* 3-ER-431–57, and then by making only a cursory argument on this point in his opening brief, *see* Br. at 34; *see also Moreno Roofing Co. v. Nagle*, 99 F.3d 340, 343 (9th Cir. 1996) ("We are not required to consider an argument that was not properly presented to the district court …."); *Christian Legal Soc'y v. Wu*, 626 F.3d 483, 485, 487 (9th Cir. 2010) (arguments not made specifically and distinctly, and supported by authority, are forfeited).

Second, and as Wen himself acknowledged in district court, the state law claims were "based on the same alleged wrongdoing that is the subject of the [federal] claims…." 2-SER-457–58. Once the district court found that the undisputed facts supported a conclusion that he and the Company had violated federal law, it was under no obligation to repeat those facts again to reach the same conclusion with respect to each state law. Notably, Wen has not identified any difference in the elements of the state law claims as compared to the federal law claims that would have made any difference in the court's analysis.

## III. The district court correctly held Wen jointly and severally liable for redress.

The district court properly entered judgment against Wen for the full amount of consumer redress, jointly and severally with his co-defendants. Wen cannot establish that the district court abused its discretion in doing so. *See Hateley v. SEC*, 8 F.3d 653, 656 (9th Cir. 1993) (reviewing decision to impose joint and several liability for abuse of discretion).

Wen primarily argues that the district court could not enter judgment holding him jointly and severally liable without first conducting an evidentiary hearing or making findings of fact concerning how much had been paid to date by other

defendants.[11] That contention is without support in law or in reason. There is no dispute that the court meant to and did impose liability for the restitution jointly and severally. 1-ER-21 (Final Judgment ¶ 65). By definition, that means that Plaintiffs can collect up to the full amount from Wen and his co-defendants—but cannot collect *more* than the total amount owed. *See, e.g.*, *WV Universal Mgmt.*, 877 F.3d at 1241 (under joint and several liability, "'each defendant is held liable for the entire amount of the harm; provided, however, that the plaintiff recover only once for the full amount'") (quoting *Honeycutt v. United States*, 581 U.S. 443, 447–48 (2017)). If there were any doubt on this score, the district court dispelled it when it provided that "[a]ny amount contributed as restitution by other defendants will reduce [Wen's] total liability by the same amount." 1-ER-64. Nothing more was required.

Wen has not cited, and Plaintiffs are not aware of, any authority supporting the novel view that, prior to holding a defendant jointly and severally liable, courts must first determine any amounts that the jointly and severally liable co-defendants

[11] Wen also challenges the district court's redress order by claiming there were genuine disputes of material fact regarding his liability during the relevant time period. As set out in Sec. II, however, those arguments are wrong, and the same redress award could stand based on Wen's direct liability for the Company's violation or his liability for substantially assisting those violations (or both).

have paid to date.[12] And it makes sense that the district court would not make such findings before issuing a final judgment: the collection and liquidation process is not immediate, as demonstrated by the fact that the receiver in this case was still liquidating assets from settling parties as late as April 2023. *See* 2-ER-159–62. The total value of assets collected from Wen and his co-defendants was a moving target at the time the court entered summary judgment against Wen. Even if the court had devoted its limited time and resources to holding an evidentiary hearing or making the findings Wen claims were required, any determination of the amount paid would soon have become outdated as Plaintiffs collected or liquidated more—thus soon putting Wen in the exact position of which he now complains. Wen's suggestion (at 40) that the court was required to somehow predict the amount that

[12] *FTC v. Commerce Planet, Inc.*, 815 F.3d 593 (9th Cir. 2016), cited by Wen (at 39–40), does not support his argument. In *Commerce Planet*, this Court vacated a judgment against an individual where the district court failed to specify that the judgment against him was joint and several with co-defendants who had previously settled. *Id.* at 602–03. In the absence of a joint and several judgment, the district court otherwise had no basis for holding the individual liable for the total amount of consumer harm. *Id*. On remand, the district court simply modified the final judgment to note that the redress ordered was joint and several, but it did not modify the total amount of the restitution included in the final judgment, *see FTC v. Com. Planet, Inc.*, No. 09-01324, 2019 WL 13146766, at *1 n.1 (C.D. Cal. May 14, 2019), an action this Court later referenced without objection, *see In re Gugliuzza*, 852 F.3d 884, 888 n.2 (9th Cir. 2017).

would be collected in the future is even further off base when those amounts remained unknown at the time the court entered judgment.[13]

## IV. The district court correctly ordered Wen to pay a large penalty.

When it came to assessing civil penalties, the district court considered Wen's central role in setting up and running a nationwide telemarketing scheme that targeted student loan borrowers who needed help, deceived them about the basic nature of its services, and took from those borrowers nearly $100 million in illegal fees they could ill afford. The district court correctly determined that Wen had acted at least recklessly as to the violations. In line with the Plaintiffs' recommendation, the court adopted a conservative count of the number of Wen's violations and determined when those violations began and ended (dates that Wen does not dispute). The court then considered all the required statutory factors and determined that a penalty of $148 million was warranted. Because the penalty amount was statutorily authorized, appropriate considering the facts, and was not unconstitutionally excessive, this Court should affirm.[14]

---

[13] Though Wen claims confusion over his remaining liability, the Bureau informed Wen of the total amount that had been collected from other sources as of shortly after the entry of the judgment against Wen, a point Wen has himself acknowledged in recent filings. 1-SER-22 (Wen Supp. Decl. ¶ 59).

[14] In his Rule 28(j) letter, Dkt. No. 29, Wen suggests that that the Supreme Court's recent decision in *Jarkesy* entitles him to a jury trial to determine the appropriate penalty. *See* 144 S. Ct. 2117. First, to the extent Wen is raising an argument under the Seventh Amendment, the argument is forfeited because he raised it for the first

### A. The district court ordered an appropriate civil penalty under the statute and in light of the facts here.

This Court reviews a district court's imposition of civil penalties at summary judgment for an abuse of discretion. *See SEC v. Husain*, 70 F.4th 1173, 1181 (9th Cir. 2023); *Nesheiwat*, 2022 WL 17958636, at *2. The district court did not abuse its discretion by imposing a penalty that is consistent with the statutory requirements and appropriate in light of the facts of this case.

The CFPA provides that any person who violates any provision of federal consumer financial law "shall forfeit and pay a civil penalty[.]" *See* 12 U.S.C. § 5565(c)(1). The amount of the penalty is determined through application of the CFPA's detailed framework, which sets out three tiers of potential civil penalties, with increasing per-day penalty amounts depending on the degree of the defendant's scienter. *See* 12 U.S.C. § 5565(c). For reckless violations, the statute authorizes the court to impose a penalty up to $34,065 for each day the violation continues. *Id.* § 5565(c)(2)(B); 12 C.F.R. § 1083.1 (2023). The statute further requires courts to consider several specified factors to determine the appropriate

---

time in his Rule 28(j) letter. *See Kilpatrick*, 35 F.4th at 1195 n.1. Second, *Jarkesy* did not change the well-established principle that "[a] summary judgment proceeding does not deprive the losing party of its Seventh Amendment right to a jury trial." *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1066 (9th Cir. 2009). Third, Wen had no right to a jury trial in the first place on the specific question of the amount of the civil penalty. *See Tull v. United State*s, 481 U.S. 412, 426–27 (1987) (holding that the "the Seventh Amendment does not require a jury trial" to determine the amount of a civil penalty).

penalty amount, namely: "(A) the size of financial resources and good faith of the person charged; (B) the gravity of the violation … ; (C) the severity of the risks to or losses of the consumer … ; (D) the history of previous violations; and (E) such other matters as justice may require." 12 U.S.C. § 5565(c)(3).

In determining the appropriate penalty amount here, the district court accepted Plaintiffs' recommendation to employ a conservative approach in counting the number of violations. Under the statute, each "act or omission that, if proved, would constitute a violation of any provision of Federal consumer financial law" can constitute a separate "violation" for purposes of assessing penalties. *Id.* § 5561(5). That means that each time the Company accepted payment of an illegal advance fee or made a deceptive misrepresentation to a consumer, it committed a discrete violation for which a civil penalty could be imposed. Under the plain terms of the statute, and employing this methodology for counting violations, Wen faced a potential maximum penalty that dwarfed what the district court ultimately ordered.[15]

Rather than using that methodology, however, Plaintiffs proposed and the court agreed to group the illegal conduct into three categories of TSR violations:

---

[15] It is undisputed, for example, that the Company requested or received at least one illegal advance fee—and in many cases, many more than one—from over 80,000 consumers. Had the court calculated the penalty based on 80,000 distinct violations, the maximum statutory penalty for reckless violations of the advance fee ban alone would have exceeded $2.7 billion.

(1) charging illegal enrollment fees; (2) charging illegal monthly fees; and (3) making deceptive statements. The court found that each of these three violations "continue[d]," *see* 12 U.S.C. § 5565(c)(2), from November 5, 2015 until the court's temporary restraining order ceased the Company's operations on October 23, 2019, for a total of 1,449 days. Wen does not dispute the beginning and end dates of the illegal conduct.

The court also determined that Wen acted recklessly in violating the law, 1-ER-59, warranting tier-two penalties. This finding, too, was well supported by the record. In determining that Wen was both directly liable for the Company's violations and that he substantially assisted them, the court found that Wen was "recklessly indifferent" to the violations, or that he at least "consciously avoided knowing" of them. *See CashCall, Inc.*, 35 F.4th at 749; 16 C.F.R. § 310.3(b). To reach that conclusion, the court explained that the evidence showed, among other things, that Wen was aware of the Company's advance fees; that he was informed about family size inaccuracies in IDR applications the Company submitted on consumers' behalf; and that he was responsible for handling consumer complaints and inquiries from law enforcement. 1-ER-53. In fact, by 2018, Wen was openly acknowledging the Company's violations. 1-ER-45. Moreover, Wen does not dispute that he (1) agreed that the Company should use numerous fictitious names to help dilute the number of consumer complaints against it, 2-ER-361 (UF 161);

(2) set up a supposedly independent dedicated account provider to create the impression that the Company qualified for an exception to the TSR's advance fee ban that did not apply, 2-ER-371–74 (UF 176–85); *see also* 16 C.F.R. § 310.4(a)(5)(ii); and (3) deleted Company emails after receiving government CIDs, 2-ER-380–81 (UF 200), and his own text messages after the court issued a temporary restraining order, 2-ER-384 (UF 205–207).

These undisputed facts established that Wen was not only aware of the Company's illegal conduct, but that he also undertook efforts to conceal its practices or obfuscate its illegality. Such facts are more than sufficient to support the district court's conclusion that Wen's violations were at least reckless, warranting tier-two penalties. *Cf. Network Servs. Depot*, 617 F.3d at 1141 n.12 ("While the term recklessness is not self-defining, … in the sphere of civil liability … [it involves] action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.") (internal quotation marks and citations omitted).

Next, the court considered whether any of the statutory factors warranted imposing a penalty below the statutory maximum. *See* 12 U.S.C. § 5565(c)(3). In determining that they did not, the court explained, first, that both the gravity of the violation and the severity of losses to consumers were large, "as over 80,000 consumers lost a combined $95 million" due to the violations, 1-ER-60, a fact that

Wen does not genuinely dispute. Consumers suffered other significant harms as well: some lost qualifying payments toward loan forgiveness; others saw their balances increase through the accrual of extra interest; others unknowingly fell behind on their payments; and still others found it difficult to make other necessary purchases after paying fees to the Company. *See* 1-ER-45–46; 3-ER-390 (UF 220). Multiple consumers also described experiencing emotional harm from the Company's practices, with one reporting that she "couldn't eat or sleep for days" after the Company's violations came to light. 3-ER-391 (UF 221); 1-SER-271 (Thelen Decl. ¶ 12).

The court next noted that Wen demonstrated bad faith. 1-ER-60. Faced with undisputed evidence establishing Wen's efforts to conceal the Company's illegal conduct—including by, for example, deleting Company emails and his own text messages while under regulatory scrutiny—and his concealment and dissipation of assets in violation of court orders, the court's conclusion that Wen acted in bad faith was well supported.

The court further determined that Wen had a history of violations, having admitted in a California Bar disciplinary proceeding to collecting fees from a client for mortgage loan modification services that were never rendered. 1-ER-60; 3-ER-418–19. And on appeal, Wen acknowledges (at 16) that he pleaded guilty and

served a sentence in federal custody for charges relating to his involvement with the Company.

With respect to the size of Wen's financial resources, the Court referenced its prior determination that there was "clear and convincing evidence that [Wen] has significant undisclosed cryptocurrency assets." 1-ER-60; *see also* page 15 n.4, *supra*. Each of these conclusions were well supported by the record.

On appeal, Wen raises a variety of arguments challenging these conclusions, but each of them misses the mark.

Wen first argues (at 43–47) that the court erred in applying tier-two penalties for the entire period beginning in November 2015 without first conducting an evidentiary hearing to determine his state of mind. Although "'[q]uestions involving a person's state of mind … are generally factual issues[,] … where the palpable facts are substantially undisputed, such issues can become questions of law which may be properly decided by summary judgment.'" *In re O'Gorman*, 115 F.4th 1047, 1058 (9th Cir. 2024) (quoting *Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985)). Here, as described above, the undisputed evidence both revealed that Wen was involved in the Company from its inception and demonstrated his recklessness throughout its operation. In fact, there was no genuine dispute that, by 2018 at the latest, Wen was not only reckless, but in fact *knew* of the Company's violations, and he admitted as much in an email in which

he acknowledged that "[a]ll clients are 'paying upfront fees[.]'" 3-ER-365–66 (UF 169).

Wen nevertheless claims (at 45–46) that the district court improperly disregarded his declaration in finding there was no genuine dispute regarding his mental state. But, as discussed above at pages 31–32, Wen's declaration failed to dispute many of the facts established in other parts of the record. Despite Wen's claims that his declaration showed he acted "with the intention" of correcting the Company's violations during the later part of its operation, he presented no evidence that any of his purportedly corrective actions stopped the illegal conduct. *See* 1-ER-55. Indeed, though Wen professed in an email that he understood "the legal obligations" of the TSR, 2-ER-366 (UF 170), he did not dispute at summary judgment that the Company continued to charge illegal fees to consumers until it was forced by the court to cease operations, *see* 2-ER-320 (UF 104); 2-ER-325–26 (UF 111–12). Wen's characterization of his intentions is insufficient to create a genuine dispute of material fact in the face of evidence showing that he continued to enable the Company's illegal conduct—and tried to conceal it—until the bitter end. *See, e.g.*, *United States v. TKW Ltd. P'ship*, No. 21-35568, 2023 WL 3116460, at *2 (9th Cir. Apr. 27, 2023) ("Against this undisputed evidence, bare declarations attesting to the [defendants'] intent … do not create a genuine dispute of material fact.").

Wen next challenges the court's inclusion of weekends and holidays in its calculation of the total number of days that the violations "continue[d]." 12 U.S.C. § 5565(c)(2). But it is undisputed that the Company's collection of illegal advance fees and its deceptive misrepresentations began no later than November 5, 2015 and did not cease until October 23, 2019. Those violations therefore "continue[d]," *id.*, for the whole of that time period—i.e., 1,449 days. *See, e.g.*, *CFPB v. CashCall, Inc.*, 2:15-cv-07522-JFW-RAO, 2023 WL 2009938, at *4-5 (C.D. Cal. Feb. 10, 2023) (calculating penalties in the same manner); *CFPB v. Future Income Payments*, Civ. Act. 8:19-2950-BHH-KFM, 2020 WL 6162947, at *8–9 (D.S.C. May 21, 2020) (report and recommendation) (same). Contrary to Wen's claim here, the statute did not require the district court and the parties to separately examine each of the 1,449 days during which the Company's illegal conduct continued before it could impose appropriate penalties.

In any event, the summary judgment record is replete with evidence that the Company operated on weekends and holidays and engaged in violations on those days. *See, e.g.*, 1-SER-255–60 (Hershenson Decl., Att. A) (signed agreement showing fees due on weekends); 1-SER-275 (Berthiaume Decl. ¶ 16) (Company debited fees from consumer's bank account on a weekend); 1-SER-154–59 (emails Nguyen sent on weekends requesting that Company action be taken). Wen's summary judgment papers cited no evidence that the Company was closed on

weekends and holidays, and Wen's declaration did not specify the Company's business hours or otherwise indicate that it did not operate on certain days.[16]

Wen also takes issue with the district court's analysis of the penalty factors under 12 U.S.C. § 5565(c)(3), but here, too, his arguments fail.[17] First, he argues that the court failed to consider his inability to pay a large penalty. But while the district court expressed doubt that the statute required consideration of "inability to pay," it went on to consider Wen's financial resources, noting its prior finding that that there was evidence that Wen "has significant undisclosed cryptocurrency assets" from which he could pay a penalty. 1-ER-60.

Though Wen claims that he has "surrendered" all cryptocurrency he owned and controlled "and to which he had access," Br. at 50, in the face of concrete and specific evidence presented by Plaintiffs establishing his ownership and dissipation of such assets, Wen repeatedly invoked the Fifth Amendment during discovery and ultimately produced no evidence to support his claims beyond his own declaration. *See* 4-ER-783–84. Wen's failure to accurately disclose his financial resources and

---

[16] As discussed above, the district court's maximum penalty calculation was, in fact, very conservative. Even if the court had erred by including weekends and holidays (it did not), that error would have been harmless because the court's analysis began with a dramatic undercount of the number of violations.

[17] In support of his argument, Wen selectively quotes (at 42) from the district court's hearing on Plaintiffs' motion for summary judgment to suggest that the penalty he was ordered to pay was "outlandish." But in the same hearing, the court explained that there was a basis for the amount Plaintiffs sought. 2-ER-173–74.

his dissipation of assets after the issuance of the court's preliminary orders prompted the district court to hold Wen in contempt. *See* 2-SER-326–37. Wen has not purged that contempt. *See* 1-SER-4. The district court did not abuse its discretion in considering the evidence establishing that Wen continued to possess those virtual assets in evaluating the size of his financial resources.[18]

Next, Wen reprises his claim that there was a genuine dispute about his state of mind to argue that the district court improperly determined that the evidence established he had operated in bad faith. But, as described above, the record was rife with evidence that Wen took pains to conceal the Company's illegal conduct, and that he then went on to conceal and dissipate his own assets in violation of court orders. This undisputed evidence is sufficient to establish Wen's lack of good faith.[19]

---

[18] Contrary to Wen's claim (at 51), the court applied the correct summary judgment standard in evaluating Wen's financial resources. The court had previously found that there was evidence establishing his ownership of cryptocurrency and other virtual assets, and as discussed above, Wen's declaration disclaiming his ownership of or control over such assets was insufficient to create a genuine dispute of fact in the face of that evidence.

[19] Wen's reliance (at 52) on *Hotel & Restaurant Employees and Bartenders Int'l. Union v. Rollison*, 615 F.2d 788, 793 (9th Cir. 1980), is misplaced. Though questions of whether a party acted with good faith may be inappropriate for summary judgment in some cases, like questions regarding a person's state of mind, such issues may be properly decided by summary judgment "where the palpable facts are substantially undisputed[.]" *Hartford Acc. & Indem. Co. v. J.R.L.A. Compliance, Inc.*, 904 F.2d 40, at *6 (9th Cir. 1990) (unpublished table decision). *SEC v. M & A West, Inc.*, 538 F.3d 1043, 1054 (9th Cir. 2008) also does

Finally, Wen claims that it was improper for the district court to consider his California Bar disciplinary proceeding as evidence of his "history of previous violations." Br. at 52–53. Even assuming the conduct at issue in the disciplinary proceeding did not constitute an act that would establish a history of violating federal consumer financial law, the court could properly consider Wen's prior conduct under the factor authorizing consideration of "other matters as justice may require." 12 U.S.C. § 5565(c)(3)(E). The district court did not err by considering that Wen admitted to similar facts raised in another legal proceeding when determining the appropriate penalty in this case.[20]

**B. The $148 million penalty is constitutionally permissible.**

A civil penalty violates the Excessive Fines Clause only if "'it is grossly disproportional to the gravity of a defendant's offense.'" *SEC v. Murphy*, 50 F.4th 832, 849 (9th Cir. 2022) (quoting *United States v. Bajakajian*, 524 U.S. 321, 334

---

not support Wen's argument. There, the party opposing summary judgment supported his claim of good faith with evidence beyond his own self-serving affidavit. *Id.*

[20] In a footnote (at 41 n.6), Wen suggests the district court erred by not evaluating the States' entitlement to penalties. But in opposing summary judgment, Wen did not dispute that the respective States' laws allowed for the imposition of penalties. *See* 3-ER-443–47. Moreover, Wen does not have to pay any additional penalties to the States beyond what he owes pursuant to the CFPA; the final judgment provided that each State receives a portion of the total penalty ordered. 1-ER-25 (Final Judgment ¶ 74).

(1998)). The penalty ordered by the district court was proportional to Wen's offense and does not run afoul of the Eighth Amendment.

To start, because the penalty ordered is within the bounds of authority provided by Congress, the penalty is presumed to be constitutional. *Id.* (because "judgments about the appropriate punishment for an offense belong in the first instance to the legislature," reviewing courts should "grant substantial deference" to the trial court's penalty determination); *see also United States v. Toth*, 33 F.4th 1, 6 (1st Cir. 2022) (affirming penalty "equal to the statutory maximum").

When evaluating the proportionality of a penalty, this Court generally considers four factors derived from the Supreme Court's decision in *Bajakajian*: "(1) the nature and extent of the underlying offense; (2) whether the underlying offense related to other illegal activities; (3) whether other penalties may be imposed for the offense; and (4) the extent of the harm caused by the offense." *Pimentel v. City of L.A.*, 974 F.3d 917, 921 (9th Cir. 2020). Here, each of these factors supports the conclusion that the penalty imposed against Wen was proportional to his offenses.

For the first factor, "[c]ourts typically look to the violator's culpability," and the level of culpability increases "if [the] defendant's violation involved reckless behavior," *id.* at 922, as it did here. Unlike the conduct at issue in cases like *Bajakajian*—which involved "solely a reporting offense," 524 U.S. at 337—Wen's

conduct in this case was egregious. As discussed above, the district court found that there was no genuine dispute that Wen engaged in conduct that caused substantial harm to tens of thousands of struggling borrowers, and that he undertook a series of steps to try to conceal his wrongdoing, demonstrating a high level of culpability. *See* pages 44–45, *supra*.

Second, in his opening brief, Wen admitted that he entered guilty pleas for charges "relating to his involvement with the [Defendant] Companies." Br. at 16. Plainly, his conduct in this case "related to other illegal activities."

Third, much steeper penalties could have been assessed against Wen based on the record before the district court. *See United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1122 (9th Cir. 2004) ("Regarding the third factor, we look to other penalties that the Legislature has authorized and the maximum penalties that could have been imposed….") (internal quotation marks and citation omitted). As discussed at pages 42–43, the court's calculation of the maximum penalty in this case was conservative. Moreover, the CFPA allows penalties of up to $1,406,728 for each day a knowing violation of the statute continued. *See* 12 U.S.C. § 5565(c)(2)(C); 12 C.F.R. § 1083.1 (2023). Despite evidence that Wen knew, and in fact admitted, by early 2018 at the latest that employees were misrepresenting consumers' family sizes and that the company was charging

illegal advance fees, Plaintiffs sought, and the district court ordered, a penalty under only tier two for reckless violations for the entire period.

Finally, the extent of the harm here was significant, as Wen and his co-defendants' conduct caused over $95 million in harm to over 80,000 people, as well as significant additional financial and emotional harms. *See* pages 44–45, *supra*.

Based on these factors, the penalty the court ordered—amounting to only one and a half times the total illegal fees collected—is appropriate. *Cf. Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1314 (11th Cir. 2021) (affirming penalty that amounted to over 1500 times the total damages); *SEC v. Rosenthal*, 426 F. App'x 1, 4 (2d Cir. 2011) (affirming penalty that was twice the illegal profits defendants generated); *cf. also SEC v. Rajaratnam*, 918 F.3d 36, 40–41 (2d Cir. 2019) (affirming civil penalties of $92,805,705 against an individual where insider trading scheme was "huge and brazen").

Wen's other points in support of his Eighth Amendment argument lack merit. The penalty amounts ordered against Wen's settling co-defendants are irrelevant. *See Murphy*, 50 F.4th at 849 ("The district court … did not have to compare the Murphys' penalties to those imposed against other defendants. A comparison to penalties imposed on other … defendants would be apples to oranges—these defendants all entered consent decrees with the SEC, so their

penalties resulted from bargained-for exchange.”). And Wen’s claimed present inability to pay the penalty also does not affect the Eighth Amendment analysis. *See Pimentel*, 974 F.3d at 924–25 (“We … decline Pimentel’s invitation to … incorporate a means-testing requirement [to assess a violator’s ability to pay] for claims arising under the Eighth Amendment’s Excessive Fines Clause.”). Even if the penalty exceeded the amount Wen purports to have made from the illegal scheme,[21] the illegal conduct at issue in this case is “serious enough to justify the penalties even if [his] pecuniary gain [was] minimal.” *Murphy*, 50 F.4th at 850 n.8.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court’s grant of summary judgment in all respects.

Respectfully submitted,

Dated: October 25, 2024

/s/ Amanda J. Krause

Seth Frotman
*General Counsel*
Steven Y. Bressler
*Deputy General Counsel*
Kevin E. Friedl
*Acting Assistant General Counsel*

[21] While Wen professed to have only received $1.55 million from the Company, Br. at 55, evidence before the district court suggested that he obtained significantly more. *See* 3-ER-401–02 (UF 10); 3-ER-404–05 (UF 12). In any event, having invoked the Fifth Amendment in response to discovery about his financial status, Wen could not for the first time at summary judgment seek to minimize his earnings.

Amanda J. Krause
Stephanie B. Garlock
*Counsel*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, D.C. 20552
(202) 435-7965
amanda.krause@cfpb.gov
*Counsel for Plaintiff-Appellee*
*Consumer Financial Protection Bureau*

Hydee Feldstein Soto
*Los Angeles City Attorney*
Jonathan H. Eisenman
*Deputy City Attorney*
Los Angeles City Attorney's Office 201 N
Figueroa Street
Los Angeles, CA 90012
(213) 978-2212
jonathan.eisenman@lacity.org
*Counsel for Plaintiff-Appellee the People of the State of California*

Keith Ellison
*Attorney General*
Evan Romanoff
*Assistant Attorney General*
445 Minnesota Street, Suite 600
St. Paul, MN 55101-2130
(651) 728-4126
evan.romanoff@ag.state.mn.us
*Counsel for Plaintiff-Appellee State of Minnesota*

Joshua H. Stein
*Attorney General*
M. Lynne Weaver
*Special Deputy Attorney General*
114 W. Edenton Street
Raleigh, NC 27602

(919) 716-6039
lweaver@ncdoj.gov
*Counsel for Plaintiff-Appellee State of North Carolina*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-55700

I am the attorney or self-represented party.

**This brief contains** 13,278 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ____________.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Amanda J. Krause **Date** 10/25/2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*

## STATUTORY ADDENDUM


**Federal Statutes**

12 U.S.C. § 5536. Prohibited acts ........ ADD-1

12 U.S.C. § 5565. Relief available ........ ADD-2

**Federal Regulations**

16 C.F.R. § 310.3. Deceptive telemarketing acts or practices ........ ADD-5

16 C.F.R. § 310.4. Abusive telemarketing acts or practices ........ ADD-6

**State Statutes**

Cal. Bus. & Prof. Code § 17200. Unfair competition; prohibited activities ........ ADD-8

Cal. Bus. & Prof. Code § 17206. Civil Penalty for Violation of Chapter ........ ADD-9

Minn. Stat. § 325F.69. Unlawful practices (Effective to July 31, 2023) ........ ADD-10

Minn. Stat. § 325D.44. Deceptive trade practices (Effective to July 31, 2023) ........ ADD-11

Minn. Stat. § 8.31. Additional duties of attorney general ........ ADD-13

Minn. Stat. § 645.24. Penalties for each offense ........ ADD-14

N.C. Gen. Stat. § 75-1.1. Methods of competition, acts and practices regulated; legislative policy ........ ADD-15

N.C. Gen. Stat. § 14-423. Definitions ........ ADD-16

N.C. Gen. Stat. § 14-424. Engaging, etc., in business of debt adjusting a misdemeanor ........ ADD-17

N.C. Gen. Stat. § 14-425. Enjoining practice of debt adjusting; appointment of receiver for money and property employed ........ ADD-18

N.C. Gen. Stat. § 75-15.2. Civil penalty ........ ADD-19

**12 U.S.C. § 5536. Prohibited acts**

(a) In general

It shall be unlawful for--

(1) any covered person or service provider--

(A) to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law; or

(B) to engage in any unfair, deceptive, or abusive act or practice;

….

**12 U.S.C. § 5565. Relief available**

(a) Administrative proceedings or court actions

(1) Jurisdiction

The court (or the Bureau, as the case may be) in an action or adjudication proceeding brought under Federal consumer financial law, shall have jurisdiction to grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law, including a violation of a rule or order prescribed under a Federal consumer financial law.

(2) Relief

Relief under this section may include, without limitation--

(A) rescission or reformation of contracts;

(B) refund of moneys or return of real property;

(C) restitution;

(D) disgorgement or compensation for unjust enrichment;

(E) payment of damages or other monetary relief;

(F) public notification regarding the violation, including the costs of notification;

(G) limits on the activities or functions of the person; and

(H) civil money penalties, as set forth more fully in subsection (c).

(3) No exemplary or punitive damages

Nothing in this subsection shall be construed as authorizing the imposition of exemplary or punitive damages.

(b) Recovery of costs

In any action brought by the Bureau, a State attorney general, or any State regulator to enforce any Federal consumer financial law, the Bureau, the State attorney general, or the State regulator may recover its costs in connection with prosecuting such action if the Bureau, the State attorney general, or the State regulator is the prevailing party in the action.

(c) Civil money penalty in court and administrative actions

(1) In general

Any person that violates, through any act or omission, any provision of Federal consumer financial law shall forfeit and pay a civil penalty pursuant to this subsection.

(2) Penalty amounts

(A) First tier

For any violation of a law, rule, or final order or condition imposed in writing by the Bureau, a civil penalty may not exceed $5,000 for each day during which such violation or failure to pay continues.

(B) Second tier

Notwithstanding paragraph (A), for any person that recklessly engages in a violation of a Federal consumer financial law, a civil penalty may not exceed $25,000 for each day during which such violation continues.

(C) Third tier

Notwithstanding subparagraphs (A) and (B), for any person that knowingly violates a Federal consumer financial law, a civil penalty may not exceed $1,000,000 for each day during which such violation continues.

(3) Mitigating factors

In determining the amount of any penalty assessed under paragraph (2), the Bureau or the court shall take into account the appropriateness of the penalty with respect to--

(A) the size of financial resources and good faith of the person charged;

(B) the gravity of the violation or failure to pay;

(C) the severity of the risks to or losses of the consumer, which may take into account the number of products or services sold or provided;

(D) the history of previous violations; and

(E) such other matters as justice may require.

(4) Authority to modify or remit penalty

The Bureau may compromise, modify, or remit any penalty which may be assessed or had already been assessed under paragraph (2). The amount of such penalty, when finally determined, shall be exclusive of any sums owed by the person to the United States in connection with the costs of the

proceeding, and may be deducted from any sums owing by the United States to the person charged.

(5) Notice and hearing

No civil penalty may be assessed under this subsection with respect to a violation of any Federal consumer financial law, unless--

(A) the Bureau gives notice and an opportunity for a hearing to the person accused of the violation; or

(B) the appropriate court has ordered such assessment and entered judgment in favor of the Bureau.

**16 C.F.R. § 310.3. Deceptive telemarketing acts or practices**

(a) Prohibited deceptive telemarketing acts or practices. It is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

…

(2) Misrepresenting, directly or by implication, in the sale of goods or services any of the following material information:

…

(iii) Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer;

… or

(x) Any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service; the amount of time necessary to achieve the represented results; the amount of money or the percentage of each outstanding debt that the customer must accumulate before the provider of the debt relief service will initiate attempts with the customer's creditors or debt collectors or make a bona fide offer to negotiate, settle, or modify the terms of the customer's debt; the effect of the service on a customer's creditworthiness; the effect of the service on collection efforts of the customer's creditors or debt collectors; the percentage or number of customers who attain the represented results; and whether a debt relief service is offered or provided by a non-profit entity.

…

(b) Assisting and facilitating. It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule.

**16 C.F.R. § 310.4. Abusive telemarketing acts or practices**

(a) Abusive conduct generally. It is an abusive telemarketing act or practice and a violation of this part for any seller or telemarketer to engage in the following conduct:

…

(5)

(i) Requesting or receiving payment of any fee or consideration for any debt relief service until and unless:

(A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

(B) The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

(C) To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

(1) Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

(2) Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt.

(ii) Nothing in § 310.4(a)(5)(i) prohibits requesting or requiring the customer to place funds in an account to be used for the debt relief provider's fees and for payments to creditors or debt collectors in connection with the renegotiation, settlement, reduction, or other alteration of the terms of payment or other terms of a debt, provided that:

(A) The funds are held in an account at an insured financial institution;

(B) The customer owns the funds held in the account and is paid accrued interest on the account, if any;

(C) The entity administering the account is not owned or controlled by, or in any way affiliated with, the debt relief service;

(D) The entity administering the account does not give or accept any money or other compensation in exchange for referrals of business involving the debt relief service; and

(E) The customer may withdraw from the debt relief service at any time without penalty, and must receive all funds in the account, other than funds earned by the debt relief service in compliance with § 310.4(a)(5)(i)(A) through (C), within seven (7) business days of the customer's request.

….

**Cal. Bus. & Prof. Code § 17200. Unfair competition; prohibited activities**

As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

**Cal. Bus. & Prof. Code § 17206. Civil Penalty for Violation of Chapter**

(a) Any person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General, by any district attorney, by any county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, by any city attorney of a city having a population in excess of 750,000, or by a county counsel of any county within which a city has a population in excess of 750,000, by any city attorney of any city and county, or, with the consent of the district attorney, by a city prosecutor in any city having a full-time city prosecutor, in any court of competent jurisdiction.

….

**Minn. Stat. § 325F.69. Unlawful practices (Effective to July 31, 2023)**

**Subdivision 1. Fraud, misrepresentation, deceptive practices.** The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

….

**Minn. Stat. § 325D.44. Deceptive trade practices (Effective to July 31, 2023)**

**Subdivision 1. Acts constituting.** A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

(1) passes off goods or services as those of another;

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4) uses deceptive representations or designations of geographic origin in connection with goods or services;

(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

(6) represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(8) disparages the goods, services, or business of another by false or misleading representation of fact;

(9) advertises goods or services with intent not to sell them as advertised;

(10) advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(12) in attempting to collect delinquent accounts, implies or suggests that health care services will be withheld in an emergency situation; or

(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

**Subd. 2. Proof.** In order to prevail in an action under sections 325D.43 to 325D.48, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

**Subd. 3. Other law.** This section does not affect unfair, deceptive, or misleading trade practices otherwise actionable at common law or under other statutes of this state.

**Minn. Stat. § 8.31. Additional duties of attorney general**

…

**Subd. 3.** Injunctive relief. In addition to the penalties provided by law for violation of the laws referred to in subdivision 1, specifically and generally, whether or not injunctive relief is otherwise provided by law, the courts of this state are vested with jurisdiction to prevent and restrain violations of those laws, to require the payment of civil penalties, to require payment into the general fund, and to appoint administrators as provided in subdivision 3c. On becoming satisfied that any of those laws has been or is being violated, or is about to be violated, the attorney general shall be entitled, on behalf of the state; (a) to sue for and have injunctive relief in any court of competent jurisdiction against any such violation or threatened violation without abridging the penalties provided by law; and (b) to sue for and recover for the state, from any person who is found to have violated any of the laws referred to in subdivision 1, a civil penalty, in an amount to be determined by the court, not in excess of $25,000. All sums recovered by the attorney general under this section shall be deposited in the general fund.

….

**Minn. Stat. § 645.24. Penalties for each offense**

When a penalty or forfeiture is provided for the violation of a law, such penalty or forfeiture shall be construed to be for each such violation.

**N.C. Gen. Stat. § 75-1.1. Methods of competition, acts and practices regulated; legislative policy**

(a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

….

**N.C. Gen. Stat. § 14-423. Definitions**

As used in this Article, the following definitions apply:

…

(2) "Debt adjusting" means entering into or making a contract, express or implied, with a particular debtor whereby the debtor agrees to pay a certain amount of money periodically to the person engaged in the debt adjusting business and that person, for consideration, agrees to distribute, or distributes the same among certain specified creditors in accordance with a plan agreed upon. Debt adjusting includes the business or practice of any person who holds himself out as acting or offering or attempting to act for consideration as an intermediary between a debtor and his creditors for the purpose of settling, compounding, or in any way altering the terms of payment of any debt of a debtor, and to that end receives money or other property from the debtor, or on behalf of the debtor, for the payment to, or distribution among, the creditors of the debtor. Debt adjusting also includes the business or practice of debt settlement or foreclosure assistance whereby any person holds himself or herself out as acting for consideration as an intermediary between a debtor and the debtor's creditors for the purpose of reducing, settling, or altering the terms of the payment of any debt of the debtor, whether or not the person distributes the debtor's funds or property among the creditors, and receives a fee or other consideration for reducing, settling, or altering the terms of the payment of the debt in advance of the debt settlement having been completed or in advance of all the services agreed to having been rendered in full.

….

**N.C. Gen. Stat. § 14-424. Engaging, etc., in business of debt adjusting a misdemeanor**

If any person shall engage in, or offer to or attempt to, engage in the business or practice of debt adjusting, or if any person shall hereafter act, offer to act, or attempt to act as a debt adjuster, he shall be guilty of a Class 2 misdemeanor.

**N.C. Gen. Stat. § 14-425. Enjoining practice of debt adjusting; appointment of receiver for money and property employed**

The superior court shall have jurisdiction, in an action brought in the name of the State by the Attorney General or the district attorney of the prosecutorial district as defined in G.S. 7A-60, to enjoin, as an unfair or deceptive trade practice, the continuation of any debt adjusting business or the offering of any debt adjusting services. The Attorney General or the district attorney who brings an action under this section may appoint a receiver for the property and money employed in the transaction of business by such person as a debt adjuster, to ensure, so far as may be possible, the return to debtors of so much of their money and property as has been received by the debt adjuster, and has not been paid to the creditors of the debtors. The court may also assess civil penalties under G.S. 75-15.2 and award attorneys' fees to the State under G.S. 75-16.1.

**N.C. Gen. Stat. § 75-15.2 Civil penalty**

In any suit instituted by the Attorney General, in which the defendant is found to have violated G.S. 75-1.1 and the acts or practices which constituted the violation were, when committed, knowingly violative of a statute, the court may, in its discretion, impose a civil penalty against the defendant of up to five thousand dollars ($5,000) for each violation. In any action brought by the Attorney General pursuant to this Chapter in which it is shown that an action or practice when committed was specifically prohibited by a court order, the Court may, in its discretion, impose a civil penalty of up to five thousand dollars ($5,000) for each violation. Civil penalties may be imposed in a new action or by motion in an earlier action, whether or not such earlier action has been concluded. In determining the amount of the civil penalty, the court shall consider all relevant circumstances, including, but not limited to, the extent of the harm caused by the conduct constituting a violation, the nature and persistence of such conduct, the length of time over which the conduct occurred, the assets, liabilities, and net worth of the person, whether corporate or individual, and any corrective action taken by the defendant. The clear proceeds of penalties so assessed shall be remitted to the Civil Penalty and Forfeiture Fund in accordance with G.S. 115C-457.2.